AO 91 (Rev. 08/09) Criminal Complaint

AUSA: Elizabeth Young  Telephone: (313) 226-9631
Special Agent: Ryan Briggs  Telephone: (703) 632-1000

# UNITED STATES DISTRICT COURT
## for the
## Eastern District of Michigan

**ORIGINAL**

United States of America,

       Plaintiff,

v.

Tamara Brown

       Defendant(s).

Case: 2:15-mj-30276
Assigned To : Unassigned
Assign. Date : 6/15/2015
Description: RE: SEALED MATTER (EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>2011 through 2014</u>, in the county of <u>Wayne</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Pay or Receive Health Care Kickbacks |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

FILED
JUN 15 2015
CLERK'S OFFICE
U.S. DISTRICT COURT

_____
Complainant's signature

<u>Special Agent Ryan Briggs, FBI</u>
Printed name and title

Sworn to before me and signed in my presence.

Date: <u>June 15, 2015</u>

_____
Judge's signature

City and state: <u>Detroit, Michigan</u>

<u>United States Magistrate Judge David R. Grand</u>
Printed name and title

## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Special Agent Ryan Briggs, being first duly sworn, hereby state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since December 2014. Since January 2015, I have been assigned to investigate allegations of health care fraud in and around Detroit, Michigan. I have received specialized training on complex financial crimes, and I have been personally involved in investigations concerning health care fraud.

2.      The facts in this affidavit come from my personal observations, my training and experience, witnesses, bank records, Medicare data, documents obtained through prior search warrants and information obtained from other agents who have investigated related cases, individuals and entities. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation as well as information provided to me by other law enforcement agents involved in this investigation and others, and Medicare claims data and bank records. Information pertinent to this investigation was also provided by private entities which contract with HHS to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse. Since this affidavit is being submitted for the limited purpose of

supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

## Overview

4. I have been involved in an investigation of Tamara Brown ("Brown") related to conspiring to pay or receive health care kickbacks, in violation of 18 U.S.C. § 371.

5. Brown is the daughter of Dr. Daphine Brown ("Dr. Brown"). Evidence gathered in the investigation of two home health care companies – Cherish Home Health Services, LLC, ("Cherish") and Empirical Home Health Care, Inc. ("Empirical"), reveals that Brown received kickbacks from the owners of Cherish and Empirical in exchange for providing home health care referrals for patients that were being seen by her mother, Dr. Brown. Cherish and Empirical then used the patients' Medicare information to bill Medicare for home health care services which were not rendered and/or not medically necessary.

**A.  The Medicare Program**

6. The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human

Services (HHS). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

7.  Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

8.  Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

9.  This investigation involves home health care services. Home health care services typically include skilled nursing, physical therapy, or speech pathology services to homebound patients. Home health services are covered by Medicare Part A.

10. Medicare claims for Part A and B are processed and paid by private insurance organizations, known as fiscal intermediaries and carriers, respectively, who contract with CMS to administer their specific part of the Medicare program.

**B.   Medicare Home Health Requirements**

11. To qualify for home health care, a beneficiary must be (1) confined to the home, (2) under the care of a physician and (3) receive services under a Plan of Care established by and reviewed periodically by a physician.

12. A beneficiary is considered confined to the home or "homebound" if he or she has a condition, due to an illness or injury, that restricts his or her ability to leave the home except with the aid of another individual or a supportive device, or if the beneficiary has a condition such that leaving his or her home is medically contraindicated.

13. Home health care is billed in 60 day increments, known as "episodes." If the beneficiary is still eligible for care at the end of a 60-day episode, a second episode of services can be provided. Each subsequent episode must be based upon a new assessment of the patient, wherein the beneficiary's physician and RN (or therapist) re-certifies the beneficiary's medical condition, need for services, and a new Plan of Care.

## Facts Supporting Probable Cause

### A. Health Care Fraud Scheme

14. Cherish was a Michigan corporation doing business at 361 Inkster Road, 2nd Floor, Inkster, Michigan 48141 that purported to be a home health agency providing in-home physical therapy, occupational therapy, speech pathology, and skilled nursing services to patients. Cherish was a Medicare provider and submitted claims directly to Medicare.

15. Empirical was a Michigan corporation doing business at 31800 Northwestern Highway, Farmington Hills, Michigan. Rahmat Begum and Muhammad Amir each owned Empirical.

16. Dr. Daphine Brown, is a physician who practices medicine under the practice name "House of Health Medical Homecare Services," located at 23060 Republic Avenue, Suite 107, Oak Park, MI 48237.

**B.    Facts Supporting Probable Cause**

17. Evidence supporting probable cause has been gathered through numerous investigative measures, including, but not limited to: (1) interviews of former Cherish and Empirical employees; (2) interviews of beneficiaries and relatives of beneficiaries billed by Cherish and Empirical and (3) analysis of Medicare data.

18. Zia Hassan, the owner of Cherish, told agents that he met with Brown in approximately 2011 or 2012. Brown told Hassan that she was a marketer who could provide home health referrals signed by D. Brown.

19. Hassan put Brown on the Cherish HH payroll and they agreed that Brown would get a salary of approximately $2,000.00 a month and Hassan would get at least four referrals a month signed by Dr. Brown, amounting to approximately $500 per patient referral.

20. According to Hassan, he took Brown off the Cherish payroll in 2013 and started paying her $400 per patient referral in cash.

21. Cherish bank records confirm that T. Brown began getting paychecks from Cherish in January 2011, which totaled bewtween $1600 and $2500 a month.

22. Harpreet Sandhu ("H. Sandhu") worked as the director of operations at Cherish, starting in 2010. In general, H. Sandhu handled day to day activities at the office, which included tracking patient referrals. According to H. Sandhu, Cherish paid Brown for patient referrals from Dr. Brown.

23. Search warrant materials from Cherish contain patient referral logs documenting that Brown was paid for referrals each patient signed by Dr. Brown and billed to Cherish.

24. All the patient referrals on Brown's Cherish referral logs were patients that were referred by Dr. Brown to Cherish for home care.

25. H. Sandhu would check the eligibility of patients that were sent by Brown and, if the patient was eligible to receive home health care services, H. Sandhu would note on Brown's log that she was getting paid for the total eligible patients.

26. For example, on September 24, 2013, Brown sent Cherish a list of patients from Dr. Brown, four of which were marked for "recert" (meaning a repeat patient who is being recertified for additional home health care episode).

6

On September, 25, 2013, H. Sandhu totaled up the patients that were eligible for home health care from Cherish, and wrote on the referral log that Cherish was "paying 2 recerts" to Brown. H. Sandu always signed her name under the total number of eligible patients that Brown was receiving payment for referring to Cherish. According to H. Sandhu's notes on the referral log, one patient already had "other homecare," one patient "can't be opened yet," and two patients were being recertified by Dr. Brown "too early" because the previous home health care episode had not ended yet.

27.  The patient referral logs also show that Brown re-sent patients that were already signed up for home health care at Cherish, in an effort to get paid more money. On August 12, 2013, Brown sent H. Sandhu a similar log to get paid for nine patients that she had referred from Dr. Brown. On August 15, 2013, H. Sandhu noted on the log that Brown was getting credited with "3 SOC" (which means starts of care or the opening of a new patient for home health care). H. Sandhu notes that for three of the patients, Brown was already "paid 7/2 not paying this time."

28.  On September 12, 2013, H. Sandhu sent Dr. Brown a fax to her office noting that three patients refused services and two patients were "too early for recert" of home health care from Cherish. All five patients were on Brown's referral logs in the previous months.

7

### *Rajibair Sandhu – Cherish HH (Billing)*

29. Rajibair Sandhu also worked at Cherish, assisting with Medicare billing. R Sandhu told agents that she would also get lists of patient referrals from Hassan and would check to see if those patients were "good," meaning eligible to be billed by Medicare. R. Sandhu checked the patients' eligibility for Hassan and let him know which patients were billable.

30. R. Sandhu also saw patient recruiters submitting lists of patient names to Cherish in order to receive payment for the referrals, which were authorized by Hassan. Sometimes Hassan asked R. Sandhu to call a patient recruiter if there was a problem with a patient. R. Sandhu told agent that the patient recruiters frequently called Cherish to ask the status of their patients and whether they were opened for home care at Cherish.

31. R. Sandhu told agents that Hassan paid Brown for referrals from Dr. Brown.

### *Rahmat Begum – Empirical (Owner)*

32. Begum, the owner of Empirical, informed agents that she paid Brown cash per patient in exchange for patients referred by Dr. Brown. Begum stated that she paid Brown in cash $450 to $550 per patient for referrals signed by Dr. Brown.

33. Begum told agents that Brown came to the Empirical office to collect her cash, which typically totaled $2,000 per month, in exchange for three to seven patients from Dr. Brown.

34. According to Begum, Brown and Dr. Brown would not refer patients without payment because other home health care agencies were paying them for Dr. Brown's referrals. According to Begum, Brown was very cautious not to inform anyone she was referring patients to Empirical.

35. Begum told agents that she last paid Brown for Dr. Browns' referrals in February 2012, but that she still owed Brown a final payment of $3,500 for Dr. Brown's referrals.

*Muhammad Aamir – Empirical (Owner)*

36. Muhammad Aamir testified at trial (*United States v. Begum*, No. 2:14-cr-20588 (E.D. Mich.) (Friedman, J.)), that he discussed with Begum paying Brown for patient referrals signed by Dr. Brown. According to Aamir, Begum first told Aamir that Empirical was paying cash to Brown for patient referrals signed by Dr. Brown in 2011.

37. In late 2011, according to Aamir, Begum stated that they owed Dr. Brown money for previously referred patients to Empirical and that Dr. Brown would not refer any more patients without getting paid the money she was owed.

9

38. Around May or June 201, when Empirical became the subject of a Medicare audit which resulted in Empirical having to return overpayments, Begum told Aamir that she would try to get more patients from Dr. Brown in order to make more money to meet their payroll and business expenses.

## Beneficiary Interviews

39. Interviews of Medicare beneficiaries show that Brown accompanied Dr. Brown on home visits to see patients that were referred to Empirical and Cherish in exchange for kickbacks to Brown.

    a.    *Medicare beneficiary H.W.*

40. On or about May 21, 2015, Medicare beneficiary H.W. told agents that Dr. Brown was her physician and that Brown would frequently accompany her to H.W.'s home. According to H.W., she is able to go grocery shopping and attend church. H.W. said that she received home health services for physical therapy, however, for about two to three months in 2013.

41. In 2011, when Cherish was paying Brown kickbacks for Dr. Brown's referrals, Dr. Brown referred H.W. to Cherish for three episodes of home health services over the course of nine months, for which Cherish was paid $12,839.48 from Medicare.

42. The following home health services were billed to Medicare for H.W. as a result of Dr. Brown's referrals, despite the fact that she could only recall two to three months of physical therapy services in 2013:

| Home Health Care Company | Date from | Date to | Amount paid by Medicare |
|---|---|---|---|
| Ace Home Care Network Inc. | 1/15/14 | 9/12/14 | $12,716.12 |
| Open Arms Home Care, Inc. | 3/25/09 | 8/6/09 | $5,113.64 |
| Tricounty HC | 11/3/11 | 10/11/13 | $31,148.81 |
| Cherish HH | 2/3/11 | 9/23/11 | $12,839.48 |
| Matrix Home Health Care | 11/24/09 | 8/4/10 | $14,410.85 |
| Ideal Home Health | 10/15/10 | 12/11/10 | $4,212.22 |

43. According to H.W., her mother, Medicare beneficiary L.C., lived with her and was also referred for home health care by Dr. Brown. H.W. said her mother received physical therapy for 2 to 3 months in 2013. H.W. told agents that, although her mother was having problems with her memory, they enjoyed going to church and grocery shopping together.

44. The following home health services were billed to Medicare for L.C. despite the fact that H.W. told agents she received physical therapy for 2 to 3 months in 2013:

| Home Health Care Company | Date from | Date to | Amount billed to Medicare |
|---|---|---|---|
| Tricounty HHC | 11/2/11 | 10/5/13 | $25,292.36 |
| Cherish HH | 3/31/11 | 8/11/11 | $8,373.53 |

45. Dr. Brown billed Medicare approximately $27,545.00 for office visits and home health care oversight for H.W. and $22,900.00 for office visits and home health care oversight for L.C between March 2009 and February 2014.

b. *Medicare beneficiary N.K.*

46. On or about May 21, 2015, Medicare beneficiary N.K. told agents that Dr. Brown was his physician and that Brown always accompanied Dr. Brown on visits to his home. N.K. said that Dr. Brown prescribed him in-home physical therapy in 6 weeks cycles that would typically involve 6 weeks of physical therapy and then a 6 week break. N.K. could not identify his physical therapists, said the physical therapists mostly made him sign paperwork instead of providing services, and had never heard of Cherish or Tricounty.

47. Between 2011 and 2013, when Cherish was paying Brown kickbacks for Dr. Brown's referrals, Dr. Brown referred N.K. for five episodes of home health services for over a year, allowing Cherish to receive $10,254.13 from Medicare.

48. Search warrant materials obtained from Cherish contain a July 1, 2013 referral log from Brown with N.K.'s information indicating that he was being recertified for what would have been his sixth episode of home health care services at Cherish HH. H. Sandhu noted on T. Brown's referral log that N.K. "refused" services. On August 15, 2013, T. Brown included N.K. on her referral log a second time and H. Sandhu noted that they were "not paying [for N.K.] this time."

49. The following home health services were billed to Medicare as a result of Dr. Brown's referrals, despite the fact that N.K. said he felt like all the physical therapists made him do was sign paperwork:

| Home Health Care Company | Date from | Date to | Amount billed to Medicare |
|---|---|---|---|
| Tricounty HHC | 6/16/10 | 4/6/11 | $7,156.20 |
| Cherish HH | 8/24/11 | 3/21/13 | $10,254.13 |

50. Dr. Brown billed Medicare approximately $20,185.00 for office visits and home health care oversight for N.K. from July 2010 to February 2014.

c. *Medicare beneficiary L.M.*

51. On or about May 14, 2015, Medicare beneficiary L.M. told agents that Dr. Brown was his physician and that Brown accompanied Dr. Brown on visits to his home. K.M. stated that he is capable of walking and driving. According to L.M., he received, and continues to receive, home health services prescribed by Dr.

13

Brown. L.M. could not identify his physical therapists and recognized the name Cherish. L.M. did not recognize the name Tricounty.

52. Search warrant materials obtained from Cherish contain an August 15, 2013 referral log from Brown with L.M.'s information. H. Sandhu made a note that Brown received payment for her referral and signed and dated her notation.

53. Search warrant materials obtained from Cherish contain a September 24, 2013 referral log from Brown with L.M.'s information with a notation that he was being recertified home health care. H. Sandhu noted on Brown's referral log that it was "too early" for the referral and Brown did not get paid for L.M.'s referral. H. Sandhu signed and dated her name beneath the notations on Brown's referral log.

54. Search warrant materials obtained from Cherish contain an October 9, 2013 referral log from Brown to Cherish with L.M.'s information with a notation that he was being recertified home health care. H. Sandhu noted on Brown's referral log there was "no need for recert" for L.M. H. Sandhu signed and dated her name beneath the notations on Brown's referral log.

55. Search warrant materials obtained from Cherish contain an October 31, 2013 referral log from Brown with L.M.'s information and H. Sandhu noted that she was "unable to get in touch" with L.M. Brown therefore did not get paid

14

for the referral. H. Sandhu signed and dated her name beneath the notations on Brown's referral log.

56. The following home health services were billed to Medicare as a result of Dr. Brown's referrals, despite the fact that L.M. said he could walk and drive:

| Home Health Care Company | Date from | Date to | Amount billed to Medicare |
|---|---|---|---|
| Tricounty HHC | 2/24/11 | 6/4/12 | $12,432.30 |
| Cherish HH | 6/7/12 | 11/12/13 | $15,436.07 |

69. Dr. Brown billed Medicare approximately $19,335.00 for office visits and home health care oversight for L.M. from April 2009 to February 2014.

### 3) Review of Medicare Claims Data

71. Based on a review of Medicare claims data, I have confirmed that Empirical was paid approximately $186,092.44 for patients referred by Dr. Brown from on or about July 22, 2010 to June 6, 2012.

72. Based on a review of Medicare claims data, I have confirmed that Cherish was paid approximately $617,786.18 for patients referred by Dr. Brown from May 12, 2010 to September 26, 2013.

73. Based on a review of the Medicare claims data, I have confirmed that Tricounty was paid approximately $764,505.27 for patients referred by Dr. Brown from March 15, 2010 to November 12, 2013.

    4)    <u>Review of bank records</u>

74. An examination of bank records revealed that between May 2010 and August 2012, approximately 48 checks were issued from a Cherish bank account to Brown, totaling $50,767.27.

75. The other payments from Cherish and Empirical were, according to Hassan and Begum, cash payments.

## **CONCLUSION**

76. Based on my training and experience and the facts presented herein, I respectfully submit there is probable cause to believe that Brown violated 18 U.S.C. § 371 (Conspiracy to Pay or Receive Health Care Kickbacks) by receiving kickbacks from Cherish and Empirical in exchange for patient referrals signed by her mother, Dr. Brown.

77. As such, I respectfully requests that an arrest warrant be issued for Tamara Brown.

                                                  Respectfully submitted,

                                                  Ryan Briggs
                                                  Special Agent
                                                  Federal Bureau of Investigation

Sworn to and subscribed to before me this _15_ day of June, 2015.

_____
United States Magistrate Judge
Detroit, Michigan